IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| SAMUEL CRAWFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-3558-CV-S-REL-SSA |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Samuel Crawford seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ failed to consider evidence of pain, (2) the ALJ did not properly analyze plaintiff's credibility, (3) the ALJ erred in failing to consider a psychological basis for pain complaints, and (4) the ALJ improperly discredited the psychologist, Dr. Eva Wilson. Plaintiff seeks judgment in his favor or, alternatively, remand for another administrative hearing. I find that the ALJ properly found plaintiff's subjective complaints not credible; the ALJ properly discounted the opinion of Dr. Wilson; and regardless of the basis for plaintiff's pain, the ALJ properly found that plaintiff's pain is not disabling. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed. Additionally, plaintiff's motion for remand will be denied.

## I.    BACKGROUND

On December 5, 2002, plaintiff filed his application for disability benefits alleging that he had been disabled since May 2, 2002.  Plaintiff's disability stems from back problems, left shoulder rotator cuff repair, rheumatoid arthritis, psychological problems associated with depression and post traumatic stress disorder, spondylosis of the cervical and lumbar spine, and a herniated disc. Plaintiff's application was denied.  On May 16, 2003, a hearing was held before an Administrative Law Judge.  On January 22, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On October 26, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the

Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because

3

of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

>Yes = not disabled.
>No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>No = not disabled.
>Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

>Yes = disabled.
>No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

>No = not disabled.
>Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert

Michael Lala, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff has earned the following income from

1971 through 2003:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $      6.40 | 1988 | $ 17,751.78 |
| 1972 | 27.61 | 1989 | 19,351.21 |
| 1973 | 252.10 | 1990 | 19,624.25 |
| 1974 | 1,000.05 | 1991 | 18,055.51 |
| 1975 | 370.58 | 1992 | 20,189.42 |
| 1976 | 5,421.33 | 1993 | 21,134.41 |
| 1977 | 5,361.22 | 1994 | 21,447.09 |
| 1978 | 3,836.38 | 1995 | 21,861.82 |
| 1979 | 4,382.63 | 1996 | 22,152.50 |
| 1980 | 1,840.25 | 1997 | 23,275.32 |
| 1981 | 0.00 | 1998 | 24,956.76 |

5

| 1982 | 0.00 | 1999 | 24,256.15 |
|------|------|------|-----------|
| 1983 | 8,934.88 | 2000 | 27,595.07 |
| 1984 | 12,935.89 | 2001 | 28,652.02 |
| 1985 | 4,615.44 | 2002 | 18,406.88 |
| 1986 | 14,888.20 | 2003 | 0.00 |
| 1987 | 20,013.68 | | |

(Tr. at 56, 59).

**Claimant Questionnaire**

In a claimant questionnaire completed on December 19, 2002, plaintiff stated that he is able to perform daily hygiene, he can load the dishwasher and do light cleaning such as dusting, and he needs help carrying things to the car (Tr. at 82-85). He wrote that he enjoys hunting, fishing, and camping, but he cannot ride in a boat, walk long distances, or climb into a tree stand to hunt (Tr. at 84). He cannot drive long distances, and he can only drive a car if it has an automatic transmission and power steering (Tr. at 84). When plaintiff goes out, he goes to church for a couple of hours at least once a week, goes to Wal-Mart, or visits friends (Tr. at 84, 85). He has no trouble leaving the house or being away from home (Tr. at 84).

**Office of Hearings and Appeals Questionnaire**

On April 29, 2003, plaintiff completed a questionnaire from the Office of Hearings and Appeals (Tr. at 87-89). He reported that he drives daily making

6

short trips, he does light housework, and he takes short walks to keep from getting stiff (Tr. at 89).

**B.    SUMMARY OF MEDICAL RECORDS**

On February 22, 2001, plaintiff saw Stanley Hayes, M.D., a rheumatologist, for his asymmetrical inflammatory arthritis (Tr. at 164).  "This has remained very limited and stable.  I would continue with just the Relafen [one gram daily]."

On June 21, 2001, plaintiff saw Dr. Hayes (Tr. at 162-163).  Plaintiff had asymmetrical inflammatory arthritis.  "His greatest emphasis of complaint currently is his low back and shoulders.  He has considerable stiffness and soreness that is aggravated by driving the heavy bulk tanker trucks. . . .  He states the vibration of the truck when he is driving through fields and holding the steering wheel for balance gives him a great deal of discomfort in his back and shoulders."  Plaintiff had an x-ray of his lumbosacral spine, and it was normal.  "Overall he has remained relatively stable.  He will maintain the Relafen [1 gram daily].  He may use acetaminophen [Tylenol] p.r.n. [as needed] for additional pain relief."

On Friday, August 24, 2001, James Wolski, M.D., took three views of plaintiff's cervical spine and three views of his thoracic spine (Tr. at 97).  His impression was "No evidence for acute injury in the cervical or thoracic spine,

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 7 of 58

Mild degenerative change including disc space narrowing at C5-C6 and minimal osteophytosis in the thoracic spine."

After having x-rays taken, plaintiff saw Richard Rethorst, M.D. (Tr. at 129-130). "The patient was in a truck this morning and was just starting up as he was crossing the field and went into a small hole and when he was looking in the mirrors to see how deep that hole was, he ran into an even bigger hole that caused his seat to really bounce him hard into the roof of the cabin, which was about five inches, he estimates, above his head. The seat belt which he says he was wearing was not at all engaged and freely let him float up. He is in here with severe pain in the base of the neck, upper thoracic spine area. He complains also about his elbows and hands having some pain from trying to grip the steering wheel and hold on. . . .

"Examination of the upper extremities shows diminished pinprick sensation along the C-6 dermatomes bilaterally. Otherwise unremarkable examination for DTRs and grips and sensation exam.

"Initial lateral C-spine film suggests a C5-6 narrowing but no fractures or dislocations are noted. Radiologic interpretation on ARTAZ for the C-spine and T-spine remainder of films shows degenerative changes only at the previously noted location. No other signs of compression fractures or any other fractures. . . .

"Impression: Compression injury to the cervical and thoracic spine with no evidence of fractures."

Plaintiff was given Toradol[1] in the office and was told to take Darvocet[2] every six hours as needed for pain. Dr. Rethorst gave plaintiff some Flexeril[3] to help him sleep over the weekend.

On August 27, 2001, plaintiff saw Dr. Rethorst for a follow up (Tr. at 128, 138). He examined plaintiff and found discomfort of the shoulders. "Palpation along the spine really shows no tenderness." Dr. Rethorst started plaintiff on physical therapy and continued his medications. "[H]e can start some modified work, but very light duty, desk work only type stuff." He released plaintiff to return to work on modified duty, no lifting over five pounds, no forwarding bending over 20 degrees, no stooping, no kneeling, no climbing, no working above chest level, no prolonged standing, and no repetitive walking.

On August 28, 2001, Kathy Markley, a physical therapist, performed an initial evaluation of plaintiff (Tr. at 112-113). Plaintiff reported having injured his neck and mid-back on August 24, 2001. He said he was not able to sleep at night and had difficulty moving his head and turning over in bed. Plaintiff said he had gone back to work on light duty. He was mainly having problems with his

---

[1]A non-steroidal anti-inflammatory.

[2]A narcotic analgesic related to codeine.

[3]A muscle relaxer.

9

right elbow when trying to hold onto the steering wheel. He expressed more concern about the pain in his neck and mid-back versus his elbow. He said he had been trying to use heat, but it only helped temporarily. He said the medications help, but he is not able to perform any functional activity while on the medication. Ms. Markley observed that plaintiff stood with noticeable kyphosis [curvature] of the thoracic spine and sat with a forward head position. Goals to be achieved in 6 visits were to decrease pain to a 1/5, plaintiff will be able to sleep at night without neck pain disturbing his sleep, plaintiff will be able to roll over in bed without increased neck pain, and he will be able to drive and turn his head without neck pain.

Also on August 28, 2001, Dr. Rethorst received old records from Dr. Stanley Hays, a rheumatologist at St. John's (Tr. at 127). Dr. Rethorst made a note in plaintiff's file that "[r]eview of the records shows the patient to have had asymmetrical inflammatory arthritis. This has been relatively stable. Doing well on Relafen and Acetaminophen [Tylenol] prn [as needed]."

John Ritter, M.D., took three x-rays of plaintiff's right elbow on August 30, 2001 (Tr. at 96). They were all found to be normal.

After plaintiff's x-rays, he went to see Dr. Rethorst for a follow up (Tr. at 126, 137). Plaintiff was doing light duty at work and was tolerating it, but continued to have pain. "The Flexeril at a full tablet keeps him sedated longer than just through the night. He is going to have to start cutting those in half."

Plaintiff had no neurologic findings, he had no bony injury as his cervical spine was negative for any acute changes. "The x-rays of the elbow are unremarkable on my interpretation for any findings." Dr. Rethorst diagnosed elbow strain, bilateral shoulder and neck strain. He continued plaintiff on his current medications, told him to cut his Flexeril dosage down to 1/2 table at bedtime. He continued plaintiff's current restrictions and recommended he continue physical therapy. He released plaintiff to return to work on modified duty, no lifting over five pounds, no forward bending over 20 degrees, no stooping, no kneeling, no climbing, no working above chest level, no prolonged standing, and no repetitive walking.

On September 4, 2001, Kathy Markley prepared a physical therapy weekly progress summary (Tr. at 110-111). Plaintiff reported that his elbow had no pain and had been feeling fine. "The patient had concerns of bilateral shooting leg pain. The patient was advised to bring new symptoms to the doctor's attention."

On September 5, 2001, Dr. Rethorst wrote a prescription for plaintiff to continue his physical therapy three times a week for two more weeks (Tr. at 108).

Joseph Mailloux, M.D., took three x-rays of plaintiff's lumbosacral spine (Tr. at 95). Dr. Mailloux found mild facet joint hypertrophy at L5-S1 and minimal early anterior osteophyte formation at the lower lumbar levels. Impression: "Lumbar vertebral body height/alignment maintained."

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 11 of 58

Plaintiff went to see Dr. Rethorst after having his x-rays taken (Tr. at 124-125, 136). "The elbow is doing better. He has two areas in the spine otherwise that are causing some discomfort on a frequent basis, one in the mid neck region and one in the mid back area. Localized palpation in those areas demonstrates some very local tenderness. Suggest he may have a ligamentous injury, since those areas have been x-rayed and show no fractures.

"Range of motion of the lumbar spine is full and unremarkable except on left lateral flexion we are able to reproduce the zinger down into the left leg. . . . Neck examination shows that he has some stiffness, but he does have decent full range of motion, although he has pain at the extremes for rotation and lateral side bending. Also, with extension. He is beginning to start doing some more home activities, although he is noticing limits on that when he pushes himself. Lumbar spine films were done today and are negative on my interpretation for any abnormalities."

Dr. Rethorst diagnosed cervical, thoracic, and lumbar spine strain secondary to a compression injury. "It appears he just has all soft tissue components, no signs of any discs at this time that are impinging, although we might have something that is causing this zinger [pain plaintiff reported goes from the back down to his left foot] that may need further detailed imaging studies. We will continue physical therapy at present and lift his restrictions slightly. He is using Darvocet, maybe one or two a day, mostly in the evenings and at bedtime.

Will continue him on that.  The muscle relaxers he is not taking much."  He released plaintiff to work modified duty, no lifting over 20 pounds, no jarring, and no prolonged sitting.

On September 11, 2001, Kathy Markley prepared a physical therapy weekly progress summary (Tr. at 107).  She noted that plaintiff has difficulty getting into comfortable positions when performing therapeutic modalities.  He was consistently changing positions.  Plaintiff was instructed to perform gentle range of motion for neck and scapular exercises.

On September 12, 2001, plaintiff saw Dr. Rethorst for a follow up (Tr. at 123, 135).  "He has been doing light duty at work mainly errand-type stuff."  Dr. Rethorst examined plaintiff.  "The examination shows his upper extremity DTR examination to have a trace to absent reflexes at the wrist, elbow bilaterally but this appears to be symmetrical.  His grip strength on the left is diminished but he reports that is because of his rheumatoid arthritis problem in the index finger on that hand.  He does have a past neck history where he had a vehicle accident that was work related.  He had an MRI scan of the C-spine done with that.  Otherwise, he feels liked it is doing well and is stable on him."  Dr. Rethorst diagnosed neck, thoracic and lumbar strain.  "His elbow seems to have resolved.  The low back area seems to have improved some as well."  He released plaintiff to return to work on modified duty, no lifting over 20 pounds, no jarring, and no prolonged sitting.  Dr. Rethorst ordered an MRI of plaintiff's cervical, thoracic,

13

and lumbar spine, and he wrote a prescription for plaintiff to continue his physical therapy for two weeks (Tr. at 106, 123).

On September 14, 2001, Kenneth Snyder, M.D., performed an MRI of plaintiff's lumbar spine and cervical spine (Tr. at 98-100). He found mild facet degenerative changes at L3-4, L4-5, and L5-S1 levels. Lumbar examination was otherwise unremarkable. He found broad-based disc osteophyte complex at C5-6, eccentric to the right, contributing to moderate right and minimal left neural foraminal narrowing. The cervical examination was otherwise unremarkable.

On September 18, 2001, plaintiff saw Dr. Rethorst for a follow up on the results of his neck MRI (Tr. at 121-122, 134). "Bilaterally his trapezius muscles and rhomboid muscles continue to be sore with weight lifting of any significance. Continues to have to constantly adjust his positioning to avoid pain and spasms in the neck area. Still not resting entirely well. I reviewed his sleep habits. He is up at 5 A.M. He goes to bed about 10 P.M.

"He is taking intermittently about a half table of Flexeril for aid in sleeping. Still avoiding most of his activities at home as far as jarring. He is having his son mow the lawn with the riding lawnmower. He is helping lift light weights at home consisting of groceries and other such items like that."

Examination showed that plaintiff is in quite a bit of discomfort from spasms and pain, he had full range of motion in his neck. "Examination otherwise is unremarkable on him. There are no symptoms or signs of

14

radiculopathy." Dr. Rethorst noted that plaintiff's rheumatoid arthritis had flared up some on his left hand. "The MRI scan, lumbar area, showed some facet degenerative changes. That may explain his low back discomfort when he is riding. Suspect this is degenerative changes. He also has some C5-6 broad based bulging discs but more located to the right than it is to the left and of course the symptoms are left predominant so that this does not appear to be the etiology of any of the symptoms on that side."

Because plaintiff reported that physical therapy only helps for a few hours, Dr. Rethorst took plaintiff off physical therapy. He continued his medications. "I am going to have him do some light home weight lifting activities, and see if we can build that restriction up, and I think we will just continue to conservatively over the next few weeks observe him. . . . If he continues to have any deterioration, consideration for pain clinic referral for evaluation, but at this point we are just about four weeks out from his injury and I think probably just conservative following over the next couple of weeks will result in significant improvement. Did refill his Relafen today." He released plaintiff to return to work on modified duty, no lifting over 25 pounds, no jarring, no prolonged sitting.

On September 25, 2001, plaintiff saw Dr. Rethorst for a follow up (Tr. at 120, 133). Plaintiff said his pain continued to be the same "really says he is not sore at all." If he stands in one spot for more than just a few minutes, however, his back muscles begin to knot up. "He is admitting to getting depressed over his

situation.  He is feeling pressure from work to return to driving the truck, and he doesn't want to do that.  He is beginning to fear that he is not going to get any better.  He is worried about the disc bulge the MRI showed.  As far as being off physical therapy for a week and re-assessing, he is feeling like he gets some benefit from the moist heat, but he is doing that at home.  Also, the ultrasound seemed to help, but otherwise the E-stim and the other modalities had no benefit at all for him."  Dr. Rethorst noted that plaintiff's examination was unchanged. He observed plaintiff constantly shifting position in his chair, he had a depressed and frustrated affect.  He assessed neck and thoracic strain "with really negative MRI findings.  Complicated now by post traumatic pain and related depression."  Dr. Rethorst requested a neurosurgical evaluation although he did not believe that plaintiff's problem was operable.  "He is resistant to the idea of a pain clinic referral.  We will continue his current medications, continue his current restrictions.  He is doing some light weight lifting at home, but he is really only using the weight bar and not much more than that.  I asked him to start using some small amounts of weights on that to see what his maximum that he can do is.  Hopefully, we will build his reassurance up by doing that."  He released plaintiff to return to work on modified duty, no lifting over 25 pounds, no jarring, no prolonged sitting.

On October 2, 2001, plaintiff saw Dr. Rethorst for a follow up on his neck (Tr. at 119, 132).  "He is beginning to use the bow some.  He is pulling about 52

pounds on a compound bow. Did flare up some of his discomfort for a few days. Home weight lifting program, he is doing some curls at about 20 pounds. On the bow, he is doing about eight shots before he is having to put it away. Other activities at home, he went out with some of his family and they got some wood recently and he says he was glad the family was along. He had quite a bit of discomfort with that." Plaintiff was experiencing pain in his right shoulder and the low back of his neck. "The patient thinks physically he is 'shot' but mentally he is doing better." Plaintiff had full range of motion in his neck. Dr. Rethorst observed that plaintiff held his neck in a "pretty stiff guarded position most of the time." He diagnosed neck and thoracic strain. "He is to see a neurosurgeon next week. I will see him back here in two weeks. In the interval, I want him to continue his home program. He is off physical therapy. Did add Baclofen up to three times a day as muscle relaxer and see if that gives him some benefit." He released plaintiff to return to work on modified duty, no lifting over 25 pounds, no jarring, no prolonged sitting.

On October 9, 2001, plaintiff saw Wade Ceola, M.D. (Tr. at 153-155). Plaintiff reported that driving, lifting, sneezing, coughing, or any prolonged activity would make his symptoms worse, and that changing positions and sitting in the recliner help his symptoms. He had tried some moderate physical therapy without success. Dr. Ceola found no obvious abnormal curvature in plaintiff's back, and no limitations in range of motion in the cervical or lumbar spine. The

17

cervical spine and lumbar spine were without tenderness to palpation. Plaintiff's gait was normal, and he could heel and toe walk normally. His motor strength was 5/5 but limited somewhat due to pain. "His sensory is markedly diminished in the C6 dermatome on the right and somewhat in the left ulnar nerve distribution. Intact to pin prick and light touch: face, upper and lower extremities." Dr. Ceola reviewed plaintiff's MRI of the lumbar spine, thoracic spine, and cervical spine. He diagnosed C5-6 spondylosis with a small disc on the right with a right C6 radiculopathy.

Dr. Ceola recommended cervical traction because of the spondylotic changes and the nerve root compromise on the right side. He also gave plaintiff a trial of a Medrol Dose Pak because of the acute right arm electrical pain consistent with a C6 radiculopathy. "Should he continue to have symptoms, the pain clinic for injections may be beneficial as well. Should all these measures fail, he would be a good candidate for a C5-6 discectomy with plating and bone grafting. I have recommended he stay on light duty activity as tolerated at work, including no lifting, no pushing, no pulling, no bending, and no climbing ladders. I have also asked him to avoid bow hunting or other strenuous activity."

On October 10, 2001, Kathy Markley discharged plaintiff from physical therapy (Tr. at 102). Plaintiff had been seen for nine visits with the last one having been on September 14, 2001. On his last visit, he was observed to be very slow with mobility from supine to sitting. He did not met his four goals of

decreased pain in his neck to a 1/5, sleeping at night without neck pain disturbing his sleep, being able to roll over in bed without increased neck pain, and being able to drive with no increased neck pain when he turns his head.

On October 15, 2001, plaintiff had his initial evaluation with John Hashagen, a physical therapist (Tr. at 143-144). Mr. Hashagen observed that plaintiff's general movements were guarded "with forward head and rounded shoulder posture. Right shoulder is elevated in abducted position. The patient's head remains side bent right during entire exam." Mr. Hashagen recommended that plaintiff begin a home exercise program.

Plaintiff saw Dr. Rethorst on October 16, 2001, for a follow up (Tr. at 118, 131). Plaintiff reported he was doing better. He was still on light duty at work. "Dr. Cheola did cut him back to ten pounds restriction." Plaintiff's main complaint was thoracic back pain. He did not have much pain in the upper extremities. Dr. Rethorst observed that plaintiff was more comfortable sitting, but did frequently change position. He continued to hold his neck in a guarded position. Dr. Rethorst diagnosed cervical and thoracic strain. He gave plaintiff a refill on his Baclofen which plaintiff reported had helped some. He also released plaintiff to return to work on modified duty with a 10 pound lifting restriction, no jarring or prolonged sitting.

On October 24, 2001, plaintiff saw John Hashagen, a physical therapist (Tr. at 142). After five physical therapy sessions, plaintiff reported minimal

improvement, and said he continued to have good days and bad days. Mr. Hashagen noted that plaintiff's general movements remained guarded, his cervical and bilateral upper extremity range of motion had improved minimally. "Patient is improving slowly with physical therapy. Patient has met all short-term goals established at initial evaluation. Patient demonstrates good rehab potential to achieve all long-term goals in time frames anticipated in 2-3 weeks."

On October 30, 2001, plaintiff saw Dr. Ceola for a follow up on his neck and arm pain (Tr. at 152). Plaintiff reported he was no better after physical therapy and thought maybe he was worse. Dr. Ceola diagnosed C5-6 spondylosis with disc herniation and radiculopathy. "I have recommended to continue with this physical therapy for the entire four week course and in addition add pain clinic for an epidural steroid injection due to the acute radiculopathy. If this dos not improve his symptoms then surgical intervention would be warranted."

On November 27, 2001, plaintiff was discharged from physical therapy (Tr. at 141). John Hashagen, the physical therapist, noted that plaintiff participated in seven physical therapy sessions from October 15, 2001, through October 29, 2001. On his last visit, plaintiff reported minimal improvement in his cervical spine. He did not return to physical therapy after October 29, 2001, and he was a no show on the following scheduled appointments. Attempts to contact plaintiff by telephone were unsuccessful.

On December 11, 2001, plaintiff saw Dr. Ceola for neck and arm pain (Tr. at 151). Dr. Ceola noted that plaintiff was last in the office on October 30. "His pain is not better and has not improved. His pain markedly increases with any activity. Motor strength is still intact at 5/5 and reflexes are diminished on the right biceps and C6 radicular symptoms." Dr. Ceola's impression was cervical spondylosis with disc herniation and radiculopathy at C5-6. He discussed different treatment options with plaintiff including "no treatment, continuing physical therapy, continuing pain clinic, and surgical intervention. Surgery would be an anterior cervical discectomy with bone graft and plating. He is certainly to the stage now that it is a very reasonable option since he has made no improvement with all the other therapies. The patient wishes to think regarding his options and will call once he has made his decision."

Plaintiff saw Dr. Hayes on December 20, 2001 (Tr. at 161, 198). "Mr. Crawford had an asymmetrical inflammatory arthritis which has a minimally reactive rheumatoid factor. His left wrist and hand have been his most symptomatic area but in the last six months that has done well and he does not have any significant complaints. He has been largely entirely functional. . . . He has apparently had a documented herniated disc on an MRI scan but has declined surgery. He is still working full-time. . . . Asymmetrical inflammatory arthritis appears relatively well-suppressed. He may continue with Relafen [one gram daily]."

On March 5, 2002, plaintiff was evaluated by Ted Lennard, M.D., for neck and arm pain (Tr. at 147-150; 184-187). Plaintiff had been referred by his employer, the City of Springfield. Portions of Dr. Lennard's report read as follows:

Mr. Crawford is a 46-year-old right handed male 16 year employee of the City of Springfield who presents for independent medical evaluation. According to Mr. Crawford, he has had three previous work related injuries. (1) In 1995 when he injured his left ulnar nerve, (2) in August of 1999 when he injured his left shoulder and elbow, and (3) this injury to his neck and arm.

In reference to Mr. Crawford's initial work injury in 1995, he states that while at work he injured his left elbow. Specifically, at that time while operating a front end loader he was forcefully pulling on a brake lever when his arm and hand slipped and he struck his left elbow directly on an object. . . . Postoperatively Mr. Crawford has done very well but he does have intermittent tingling into the fifth digit and a subjective feeling of weakness in the left hand. These symptoms have not changed now for several years, causing him minimal problems with any functional task.

In reference to the injury in August of 1999, Mr. Crawford tells me that while trying to start a gas pump he was vigorously pulling with the left upper extremity. He noted that during this task he had sharp pain in the left shoulder. . . . He did undergo injection to the left shoulder with benefit as well as additional physical therapy. X-rays revealed type II acromion but no significant osteoarthritic changes to the shoulder. Shoulder surgery was recommended. During the meeting of 06-12-00 to discuss surgery it was noted that he had moderately swollen joints, especially at the MCP joint of the index finger of the left hand. He was referred for rheumatological consultation at which time he was diagnosed with rheumatoid arthritis. Shoulder surgery was ultimately cancelled and since that time Mr. Crawford states that overall his shoulder has improved somewhat. He does have pain with "too much lifting" or with overhead activities with the left upper extremity. He no longer has nocturnal pain in the left shoulder.

In reference to his third work related injury on 08-24-01, he states that he was injured when he "jammed my head twice on the roof of a 4,000 gallon

22

tanker trunk." . . . He had a total of six weeks of therapy at St. John's Physical Therapy Clinic. Dr. Ceola did recommend surgery to the cervical spine but Mr. Crawford declined this form of treatment.

At present Mr. Crawford complains of pain in the neck and at times into the right arm and anterior aspect into the elbow. 70% of his pain is in his neck and the remaining 30% into the right arm. Rarely does he have any symptoms below the elbow on the right. His neck and right arm are worse with bending, reaching, standing, driving, sneezing, coughing, lifting, climbing and at times lying. It is better with rest or moving different directions. . . .

PHYSICAL EXAMINATION:
General: . . . He sits and stands slowly. He transfers to the exam table independently.
Cervical Spine and Bilateral Upper Extremities: He has moderate limitations in cervical rotation to the right, lateral flexion to the right and cervical extension. He has full motion on cervical flexion and left cervical rotation although he does so slowly, complaining of pain. He has full motion of both shoulders although he does this very slowly, complaining of pain with the left shoulder. Passively I can move these joints through full motion. He has full motion of both elbows, wrists and fingers.
* * * * *
Neurological: . . . Manual muscle testing reveals 5/5 strength in the major muscle groups of both upper extremities. . . .

REVIEW OF MEDICAL DATA:
Multiple medical records were reviewed. This included a letter from Linda Richardson dated 03-04-02 as well as handwritten accident reports from the City of Springfield. Records from Dr. Rethorst for treatment dated 08-24-01, 08-27-01, 08-28-01, 08-30-01, 09-05-01, 09-12-01, 09-18-01, 09-25-01, 10-02-01 and 10-16-01 were noted. Dr. Ceola's report of 10-09-01 was reviewed including recommendations of CT scan through the cervical spine. Follow up visits dated 10-30-01 and 12-11-01 were noted. St. John's physical therapy records dating back to 10-01 were reviewed. Additional records were reviewed including those MRI reports of the thoracic, cervical and lumbar spine. The cervical spine study revealed a disc osteophyte complex at the C5-6 level off to the right. Dr. Putnam's records dating back to 09-22-99 and subsequent treatment were noted. His record of 06-12-00 was reviewed indicating the onset of swelling of the hands and the postponement of left shoulder surgery. Job duty specifics as a maintenance worker were reviewed including the central functions

23

and important functions.

IMPRESSION:
1. Left ulnar neuropathy, status post ulnar nerve transposition with good results.
2. Left rotator cuff tendinitis.
3. C5-6 disc abnormality.

PERMANENT PARTIAL IMPAIRMENT:
In reference to Mr. Crawford's left ulnar neuropathy, he will have an impairment of 10% of the left upper extremity. . . .  He will also have an additional 10% of the left upper extremity . . . for his rotator cuff injury and subsequent functional difficulty with overhead tasks.  In reference to Mr. Crawford's cervical spine injury, specifically the C5-6 disc abnormality, he will have an additional 10% to the body as a whole.

DISCUSSION:
Mr. Crawford has been through extensive treatment.  Surgical intervention has been recommended by Dr. Ceola and Mr. Crawford has declined this form of treatment.  He has also been through extensive therapy in reference to the left shoulder.  Unfortunately, he continues to have objective abnormality on imaging studies as well as continued functional difficulties that correlate with these objective abnormalities.  At this point he should avoid activities that require overhead use of the left upper extremity as well as lifting more than 10 lbs, prolonged bending and stooping activities.  After reviewing the essential functions of his job as a maintenance worker, I do not believe that he will be able to perform the essential or important functions of this specific job.

(Tr. at 147-150).

On March 20, 2002, Dr. Lennard completed an Attending Physician's Statement of Disability (Tr. at 182-183).  The form was completed with the following information:  plaintiff's onset of injury was August 1, 2001; he first saw Dr. Lennard on March 5, 2002; he has not been confined to the house or in a hospital for the past year; he is disabled in that he will be unable to perform his duties as an employee; and in Dr. Lennard's opinion the disability is permanent.

24

He recommended that plaintiff avoid overhead use of his left arm, no lifting more than ten pounds, and no prolonged bending or stooping.

On June 20, 2002, plaintiff saw Dr. Hayes (Tr. at 160, 197). "Mr. Crawford has an asymmetrical inflammatory arthritis. In the last few days, he has had soreness along the flexor tendon of his left fourth finger, which in the past has had a triggering effect. He has some soreness in his great toe MTP's always but they do not swell. Other joints have done well. He has been given a medical disability retirement from his employment with city utilities because of a cervical disc. He declined surgery. . . . Fingers are not swollen. He does have tenderness on the left fourth finger flexor tendon, but no triggering. Fists are functional. Wrists, elbows and shoulders have full mobility. Knees are nonswollen. Ankles are nonswollen." Dr. Hayes diagnosed asymmetrical inflammatory arthritis - relatively limited. He prescribed Ibuprofen.

On December 5, 2002, plaintiff returned to see Dr. Hayes (Tr. at 196). Plaintiff complained of pain in his fourth finger on his left hand and pain in his left ankle which interferes with his endurance for weightbearing activities. "Other joints are generally doing well and he is functional for all independent ADL [activities of daily living]." Dr. Hayes performed an exam and found full extension and good alignment of the fingers, fists were functional, tenderness in the left fourth finger, elbows were unremarkable, shoulders were unremarkable, knees were not swollen, left ankle had tenderness, the ankle mobility was good, right

ankle was nonswollen. His impression was asymmetrical inflammatory arthritis. "I have discussed an injection but the patient declines."

On January 2, 2003, a consulting physician prepared a Physical Residual Functional Capacity Assessment (the doctor's signature is illegible) (Tr. at 170-177). The doctor found that plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; could stand or walk about six hours in an eight-hour day; could sit for about six hours in an eight-hour day; could push or pull only ten pounds with his upper extremities; could occasionally climb ramps or stairs but could never climb ladders, ropes, or scaffolds; could frequently balance, stoop, kneel, and crouch; could occasionally crawl; had no restrictions on reaching, handling, fingering, or feeling; and had no environmental limitations.

On April 7, 2003, plaintiff saw Malcolm Oliver, M.D., for the purpose of reevaluating his disability status (Tr. at 179-180). Dr. Oliver completed a Restatement of Disability by Attending Physician. He stated that plaintiff's condition had changed in the last year by having increased weakness in his left hand and decreased grip strength. He noted that plaintiff had not been confined to his house or hospitalized during the past year. The final question on the form is "Is the patient's present condition such that he or she will be able to resume the original duty as an employee in the position held at the time of disability retirement?" and the doctor checked, "no".

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 26 of 58

On May 23, 2003, plaintiff saw Eva Wilson, Psy.D., for a psychological

evaluation (Tr. at 202-204). Portions of Dr. Wilson's report are as follows:

REFERRAL SOURCE: Mr. Crawford was referred by Rick Vasquez, attorney at law, in order to complete a clinical evaluation. Ms. [sic] Crawford has been attempting to qualify for Social Security Disability for some time. He retired in May of 2002 and does receive a retirement benefit.

INFORMATION SOURCE(S) AND RELATIONSHIP TO CLAIMANT: Mr. Crawford provided me with his own information.

PRESENTING PROBLEM AND SYMPTOMS: . . . He has been told by his physicians, Dr. [Lennard] and Dr. Oliver, that he is unable to work at all. He says that there are times when he cannot even pick up a coffee cup and times when he cannot walk at all. . . . He is suffering from memory problems, depression, and denies suicidal ideation. He also has dreams about the accident, flashbacks about the accident, and, whenever he sees a city truck, he will remember the accident in full detail. . . .

PRESENT MENTAL ILLNESS: Mr. Crawford is suffering symptoms of post-traumatic stress disorder but is not consulting with any psychiatric or psychological intervention at this time. He feels very bitter about his situation. He is not taking any medications for mental illness. He has a great deal of trouble sleeping.

* * * * *

FAMILY CIRCUMSTANCES: . . . Mr. Crawford spends part of his day going to auctions when he feels well enough. He cannot sit or stand long. He enjoys reading magazines but cannot hunt anymore, which was an occupation that he enjoyed very much.

* * * * *

THOUGHT CONTENT AND PERCEPTION: These were within normal limits.

MODIFIED MINI MENTAL STATE EVALUATION: Mr. Crawford produced a score of 52 on this test, which was in the normal range of intellectual functioning.

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 27 of 58

<u>MEDICAL SOURCE STATION/OPINION</u>:  It is my opinion that Mr. Crawford would not have difficulty understanding or remembering simple, possibly some semicomplex, but not complex instructions due to his tendency to become distracted from post-traumatic stress disorder symptoms.  There are some days when he would have trouble sustaining concentration and persistence with any tasks at this time for the same reasons.  He does not appear to have trouble interacting socially on a one-on-one basis but tends to be withdrawn and would probably not do well with the public.  I do not believe that he would have trouble adapting to his environment.

<u>PROGNOSIS AND RATIONALE</u>:  Mr. Crawford's prognosis is good should he receive psychotherapy.

* * * * *

<u>DIAGNOSTIC IMPRESSIONS</u>:
Axis I:        Post-traumatic Stress Disorder, chronic, moderate-severe[4]
                    * * * * *
Axis V:        Current GAF (Psych) 50, Serious to 60, Moderate, Past Year
                    50, Serious, to 60, Moderate

(Tr. at 202-204).

That same day, Dr. Wilson prepared a Medical Source Statement (Tr. at 205-208).  She found that plaintiff has a medically determined mental impairment that has lasted or can be expected to last at least 12 continuous months (Tr. at 205).  Dr. Wilson found that plaintiff is not significantly limited in the following:

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

--------------------

   [4]I point out here that this entire form was typed, except handwritten after the word "moderate" was "-severe".  I do not know who wrote that or when it was written on this form.

28

■ The ability to respond appropriately to changes in the work setting

She found that plaintiff is moderately limited in the following:

■ The ability to remember locations and work-like procedures

■ The ability to understand and remember very short and simple instructions

■ The ability to carry out very short and simple instructions

■ The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

■ The ability to work in coordination with or proximity to others without being distracted by them

■ The ability to make simple work-related decisions

■ The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

■ The ability to interact appropriately with the general public

■ The ability to accept instructions and respond appropriately to criticism from supervisors

■ The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

■ The ability to be aware of normal hazards and take appropriate precautions

■ The ability to travel in unfamiliar places or use public transportation

■ The ability to set realistic goals or make plans independently of others

She found that plaintiff is markedly limited in the following:

■ The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to sustain an ordinary routine without special supervision

Apparently for clarification, the form asks the doctor to answer the following questions:

> Would this individual have the capacity to perform the following work related mental activities on a sustained basis. (Under Social Security Ruling 96-8P, sustained work activity is considered to be work that is performed on a "regular and continuing basis," that is, 8 hours a day, for 5 days a week.)

| ___ Yes | _X_ No | To understand, remember and carry out simple instructions |
| ___ Yes | _X_ No | To make judgments that are commensurate with the functions of unskilled work, i.e., simple work related decisions |
| _X_ Yes | ___ No | To respond appropriately to supervision, co-workers and usual work situations |
| _X_ Yes | ___ No | To deal with changes in a routine work setting |

(Tr. at 208).

Finally, Dr. Wilson write that her first evaluation of plaintiff was May 23, 2003 (the date the form was prepared), there was no date of last evaluation or treatment, and Dr. Wilson believed that plaintiff's restriction can be expected to last one year or longer (Tr. at 208).

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 30 of 58

*C.*     *SUMMARY OF TESTIMONY*

During the May 16, 2003, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

Plaintiff testified that at the time of the hearing he was 47 years of age (Tr. at 212).  He went to school through tenth grade (Tr. at 212).  Plaintiff does not have a G.E.D., but he did attend vocational technical training when he was in high school (Tr. at 213).   When asked whether he is pursuing a G.E.D. now, plaintiff said, "I'm thinking about it real strong.  I don't know if it'll do me much good at this point, but it might.  You know, it's just something I'd like to do." (Tr. at 217).

Plaintiff lives on ten acres outside of town in Billings, Missouri (Tr. at 232). His wife works, and his 17-year-old son lives at home (Tr. at 233).  He puts a garden in every year, and the year of the hearing he pulled weeds and worked the ground up a little bit (Tr. at 235).  He got some old carpet scraps that he is cutting and laying down between the rows of vegetables so he does not have to weed so often (Tr. at 235).  Plaintiff has a tiller that he uses, but he can only use it for about 20 minutes at a time (Tr. at 235-236).  Plaintiff hunts with his friends (Tr. at 236-237).  The last time plaintiff went hunting, he got a deer, but his cousin got it out of the field for him (Tr. at 237).  He was out hunting that time for three days (Tr. at 237).  Plaintiff hunts for turkeys, and he went out that spring

with his nephew (Tr. at 237). During the three-week season, he went out about six times (Tr. at 237). He got one turkey (Tr. at 238). In the past, plaintiff would put up tree stands and climb up, but now he just stays close by his truck and sits down (Tr. at 238). Now he does very little tree climbing, and he is attempting to get a ladder stand (Tr. at 239). He did climb a tree the year of the hearing, but he did not put his stand up (Tr. at 239). Plaintiff goes to church (Tr. at 238). "Every time the door's open, I try to make it there." (Tr. at 238).

Plaintiff worked for the City of Springfield for about 16 1/2 years (Tr. at 213). Before that, he did construction work, masonry, steel and vinyl siding, and sheetrock work (Tr. at 213).

Plaintiff spent 11 years of his employment with the City as a maintenance worker (Tr. at 216). Before that he was a laborer and then an Equipment Operator (Tr. at 216).

When plaintiff was working for the City, he injured his shoulder trying to start a gas-powered pump (Tr. at 217). It pulled his shoulder out of the socket and almost separated it (Tr. at 217). His rotator cuff was damaged but not torn (Tr. at 217-218). Now plaintiff cannot reach overhead, and he is lucky to put dishes in the cabinet sometimes (Tr. at 234). He eventually went back to work despite his shoulder injury (Tr. at 218). Plaintiff did physical therapy for his shoulder and finished that about a year before his second work accident (Tr. at 234).

Plaintiff's second accident at work occurred when he was driving his 3,500 gallon tanker truck through a field and his driver's side tire went into a hole about two feet deep that he had been unable to see (Tr. at 214-215, 216). When the tire went into the hole, the truck went down and he went out of his seat and hit his head on the ceiling of the truck (Tr. at 215). When the truck came out of the hole, he went back down onto the seat which was an air-ride suspension seat (Tr. at 215). That catapulted plaintiff back out of the seat and he hit the ceiling of the truck again (Tr. at 215). He had a tingling sensation all the way down his back and into his left leg and he could barely move (Tr. at 215).

Plaintiff eventually got the truck out of the field and made it a little way up the road where he ran into his supervisor who took plaintiff to the hospital (Tr. at 215). Plaintiff was never released to return to work, and his employer told him to either take retirement or as of May 10, 2001, he was out of a job (Tr. at 219).

Plaintiff loves outdoor sports, walking through the woods, fishing, and hunting (Tr. at 219). Since his accident, it has been hard to do anything (Tr. at 219). "I mean, I'm lucky to mow my yard." (Tr. at 219). Plaintiff used to fish, hunt, and play with his son (Tr. at 224). He cannot play with his son anymore, and he cannot work to take care of his family (Tr. at 224). Plaintiff used to fish all the time, but now he only fishes about once a week (Tr. at 224). Instead of casting his fishing rod, he "pitches" it (Tr. at 225). He used to cast it 34 yards, but now he can only pitch it 20 to 25 yards (Tr. at 225).

33

Plaintiff gets stiff through his shoulders and into his back and hips when he sits (Tr. at 225). He needs to stand up to stretch himself out, then he can sit back down for a little while (Tr. at 225-226). Plaintiff could sit at a desk for 15 to 20 minutes at the most (Tr. at 226). He would then need to stand up and stretch for about ten minutes before he could sit back down (Tr. at 226). Plaintiff said he could not do a desk type job because he would not be able to reach his hands out in front of him to get something (Tr. at 227). He could not tolerate the six hours per day of sitting (Tr. at 226). After his accident, plaintiff tried to go back to work on light duty and he helped the secretary sort files (Tr. at 228). He sorted bills of lading by number and put them away (Tr. at 228). Plaintiff did that for three or four months eight hours per day (Tr. at 228). Plaintiff would work for a little bit, then get up and walk outside and stretch, and the sun shining on him felt good so he would walk outside for a minute, and then come back in to work more (Tr. at 228). Plaintiff took breaks like that about three our four times per hour (Tr. at 228).

Plaintiff discussed surgery with his doctor, but his doctor said he could not guarantee plaintiff's back would be better and surgery might even make it worse (Tr. at 220). Although plaintiff's doctor was ready to operate, plaintiff and his wife discussed the risk factors and opted not to go forward with the surgery (Tr. at 220). Plaintiff has had no further treatment on his back (Tr. at 221).

Plaintiff sees Dr. Hays for rheumatoid arthritis about every four to six months (Tr. at 220). Plaintiff's arthritis causes a lot of pain and swelling in his joints (Tr. at 220). Plaintiff takes two kinds of medication for his arthritis (Tr. at 220-221).

Plaintiff currently experiences pain in his left shoulder, left elbow, and left hand (Tr. at 222). His hand swells to the point where he cannot touch his little finger to his thumb (Tr. at 222). Plaintiff has trouble gripping things, and can hardly button his shirt sometimes (Tr. at 223). Trying to do too much causes the pain to be worse, and some medications help it a little (Tr. at 222-223). Although plaintiff does not have too much trouble with his right arm, he cannot reach out in front of himself to lift things (Tr. at 223). Plaintiff's left ankle and left hip hurt so that he can hardly walk sometimes (Tr. at 222).

Plaintiff can mow his lawn in about an hour and 20 or 30 minutes (Tr. at 229). Before his accident, he could mow in an hour or maybe an hour and 10 minutes (Tr. at 229). He uses a riding mower, and he has to stop and get off about four or five times while he is mowing (Tr. at 229). His breaks are ten to 15 minutes long each (Tr. at 229-230). Plaintiff's attorney then asked, "So when you said that it takes you, now, about an hour and 20 minutes did you -- did that include the times that you stopped for breaks or is that just the time you're actually out there mowing?" (Tr. at 230). Plaintiff said, "That's probably just the time it takes me to mow, because I got to go quite a bit slower. I use a different

35

gear on the rider. You now, it's not near as fast. I can't take the jarring." (Tr. at 230). After he is done mowing, he goes inside and sits in his recliner (Tr. at 229).

Plaintiff walks around his yard, but he does not go for walks (Tr. at 230). He has trouble walking on his left ankle sometimes (Tr. at 230). He goes grocery shopping with his wife but she pushes the cart because she puts her purse in the cart (Tr. at 230). Plaintiff can drive, but not long distances because he cannot hold onto the steering wheel like he needs to (Tr. at 231). He drove about 30 minutes to get to the administrative hearing (Tr. at 231). He had no trouble driving that far, except it was raining and the rain bothers him (Tr. at 231). During the last year, the farthest plaintiff ever drove was 60 to 65 miles (Tr. at 231). He and a friend drove to Stockton and stopped twice to use the bathroom, get coffee, and walk around (Tr. at 231). On that trip, he rode more than he drove (Tr. at 232). Plaintiff cannot drive an automobile with a standard transmission because he cannot push down on the clutch with his left foot and he cannot hold the steering wheel with his left hand to shift gears (Tr. at 232).

**2. Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. He testified that plaintiff's past relevant work consists of working as a municipal maintenance worker and a heavy equipment operator (Tr. at 241).

36

The first hypothetical assumes the person could stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; could lift ten pounds occasionally and less than ten pounds frequently; should avoid frequent or repetitive pushing, pulling, stooping, power gripping, and twisting; and should avoid climbing, balancing, heights, and hazardous unprotected moving machinery (Tr. at 241). The vocational expert testified that such a person could be a mail clerk, DOT 209.687-026, with 1,300 jobs in the state of Missouri and 242,000 in the nation (Tr. at 241-242). The person could also be a parking lot attendance, DOT 915.473-010, with 915 jobs in Missouri and 187,800 in the country (Tr. at 242). These jobs are both considered light, not because of the lifting requirements, but because of the standing requirements (Tr. at 242).

The ALJ's second hypothetical was the same as the first but assumed the person could only stand for four hours per day (Tr. at 242). The vocational expert testified that the person could still perform those two jobs (Tr. at 242).

The ALJ's third hypothetical was the same as the second but assumed the person could only stand or walk 15 to 20 minutes at a time and sit for 15 to 20 minutes at a time (Tr. at 242). The vocational expert testified that the person could still perform those two jobs (Tr. at 242).

The ALJ's fourth hypothetical was the same as the second, but assumed that the person must avoid frequent or repetitive fine finger dexterity (Tr. at 242). The vocational expert testified that the person probably could not be a mail clerk,

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 37 of 58

but could work as a parking lot attendant (Tr. at 242, 245). The Dictionary of Occupational Titles states that both of these jobs require frequent manipulation, gripping, handling, and dexterity (Tr. at 243). Although the Dictionary of Occupational Titles states that frequent manipulation, gripping, handling, and dexterity are required for a parking lot attendant job, it is the vocational expert's opinion that a person could perform that job without frequent manipulation, gripping, handling, and dexterity (Tr. at 243).

The vocational expert also testified that pushing and pulling are not required for those two jobs (Tr. at 244).

The Dictionary of Occupational Titles does not distinguish between reaching overhead, out front, or reaching down (Tr. at 244). But in the vocational expert's opinion, in inability to reach overhead would not preclude employment in either of these two positions (Tr. at 244).

The plaintiff's attorney asked whether the person in the first hypothetical could work if he could sit for only 15 to 20 minutes at a time and not six hours out of an eight-hour day (Tr. at 245). The vocational expert testified that the person could still perform those jobs because he could stand for six hours (Tr. at 245).

If the person could stand for less than two hours, walk for less than two hours, and sit for less than six hours, the person could not perform those jobs (Tr. at 245).

On September 19, 2003, the vocational expert completed interrogatories building on the first hypothetical listed above (Tr. at 94). The first additional hypothetical was as follows:

The person is limited to simple unskilled tasks involving a simple routine, or repetitive tasks, which do not require the person to sustain a high level of concentration for long periods of time, such as sustained precision or sustained attention to detail. Also assume that the person should avoid frequent or prolonged close personal interaction with the public. "Would these limitations prevent the persons from performing the jobs of mail clerk or parking lot attendant?" (Tr. at 94). The vocational expert marked "yes" as to parking lot attendant, and "no" as to mail clerk.

The vocational expert also identified two other jobs that the hypothetical person could perform: slicing machine operator (D.O.T. 521.685-302), a light level job with 880 positions in the state and 113,000 in the nation, and routing clerk (D.O.T. 222.687-022), a light level job with 1,300 jobs in the state and 193,000 in the nation (Tr. at 94).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge David K. Fromme entered his order on January 22, 2004. At step one of the sequential analysis, the ALJ found that plaintiff has not worked since his alleged onset date (Tr. at 14). At step two, he found that plaintiff suffers from arthritis, left shoulder impingement syndrome, and

39

spondylosis of the cervical and lumbar spine, impairments which are severe (Tr. at 14). At step three, he found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Before proceeding to step four, the ALJ analyzed plaintiff's credibility and found that, based on plaintiff's daily activities, lack of medication side effects, and the medical evidence, plaintiff is not being entirely credible in alleging disability (Tr. at 16-17). The ALJ found that plaintiff retains the residual functional capacity to lift or carry less than ten pounds frequently and up to ten pounds occasionally; to stand or walk for up to six hours in an eight-hour day; to sit for up to six hours in an eight-hour day; should avoid frequent or repetitive stooping, climbing, balancing, power gripping, and exposure to heights and hazardous unprotected equipment (Tr. at 17). He found that plaintiff's post traumatic stress disorder results in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had no recent episodes of deterioration or decompensation of extended duration (Tr. at 18).

At step four of the sequential analysis, the ALJ found that plaintiff could not return to his past relevant work (Tr. at 18). At step five, he found that plaintiff could perform other jobs, such as slicing machine operator with 880 jobs in Missouri and 113,000 nationally, or routing clerk, with 1,300 jobs in Missouri, and 193,000 nationally (Tr. at 19).

40

Therefore, plaintiff was found not disabled at step five of the sequential analysis.

## VI.     CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.     CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal

41

observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> On a questionnaire he said that he is able to do his daily hygiene, but has to have help carrying groceries etc. to the car.  He said the he does light housecleaning.  He said that he can drive a car as long as it is automatic and has power steering, but not for long distances.
>
> At the hearing he testified that back surgery has been considered but that it might make it worse.  He said that he has problems gripping and using his left hand.  He said that he could sit for 15 to 20 minutes; stand and walk around such as in doing yard work for over an hour.  He said that he went hunting last fall for deer and went turkey hunting this spring.
>
> . . .  The claimant testified he has very limited ability to sit or stand, yet is able to go hunting and to auctions.  He continues to shop, visit friends, go to church, and take care of his yard and garden.  Claimant's self-reported activities of daily living are inconsistent with such allegations of totally debilitating symptomatology. . . .
>
> The clinical and objective findings herein are inconsistent with allegations of total debilitation.  The record is devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, and indication that claimant

42

continues to move about on a fairly regular basis. The Administrative Law Judge also notes the claimant has not been prescribed other pain modalities such as a TENS unit, a back brace, or an assistive device for ambulation, and he has never been referred to a pain management clinic[5] notwithstanding his complaints of debilitating pain.

The Administrative Law Judge has examined the claimant's work record and notes the claimant has a very good earnings record prior to his injury on the job. He has since relied on his medical retirement and his wife's earnings, and has not attempted alternative employment. His work record does not outweigh the other evidence of record, including the medical evidence.

The claimant has not reported any significant side effects from his medication that would affect his ability to work.

(Tr. at 16-17).

## 1.  PRIOR WORK RECORD

The ALJ correctly pointed out that plaintiff had a good work record. He

spent 16 years employed by the City of Springfield. Once he received disability

retirement from that employer, he did not seek any other employment.

## 2.  DAILY ACTIVITIES

The ALJ relied heavily on plaintiff's daily activities in finding his subjective

complaints not credible. The record supports the ALJ's analysis. Less than one

month after plaintiff's injury, he told Dr. Rethorst that he was helping lift light

weights at home such as groceries. Dr. Rethorst recommended that plaintiff do

some home weight lifting activities. About two weeks later, plaintiff told Dr.

_____

[5]Plaintiff argues this is incorrect because his doctor recommended a pain clinic. The evidence establishes that plaintiff declined to go to a pain clinic, and there is no evidence in the record of plaintiff attending a pain clinic.

43

Rethorst that he had begun using his bow, pulling about 52 pounds on a compound bow. He was doing weight-lifting curls with 20 pounds of weight. He was able to help his family bring in wood. On December 5, 2002, plaintiff told Dr. Hayes that he was doing well, and he was functional for all independent activities of daily living. Plaintiff was able to work full time, eight hours per day, on light or modified duty which included basically desk-type work, from shortly after his injury until he took disability retirement the following year.

He reported in a claimant questionnaire that he could load the dishwasher and do light housework. He wrote that he enjoys hunting, fishing and camping, although those activities are somewhat modified from how he performed them before his injury. He reported that he goes to church "for a couple of hours" at least once a week.

Plaintiff testified that he puts in a garden every year, he pulls weeds, he worked the ground up, he was cutting and laying carpet scraps in his garden, he uses a tiller for 20 minutes at a time, he hunts with his friends, he went hunting for three days during the last deer season, he went out turkey hunting six times shortly before the administrative hearing, he was able to climb a tree to go hunting, he goes fishing about once a week pitching his rod 20 to 25 yards, and he can use a riding lawn mower to cut his grass in about one hour and 20 minutes to one hour and 30 minutes, which is only about ten to 20 minutes longer

than it took him before his injury.  These daily activities are inconsistent with plaintiff's claims of total disability.

Seven days after his hearing testimony, plaintiff told Dr. Wilson that he is unable to pick up so much as a cup of coffee, and at times he cannot walk at all. He told her that he could not hunt anymore.  This is a stark difference from his testimony one week earlier, and these inconsistencies support the ALJ's decision to discredit plaintiff's subjective complaints.

### 3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

On September 4, 2001, plaintiff told his physical therapist that his elbow had no pain and had been feeling fine.  Ten days later, he told Dr. Rethorst that his neck trouble from his previous accident was doing well and "is stable".  His elbow was resolved, the low back area had improved.  In late December 2001, plaintiff told Dr. Hayes that his arthritis had done well over the past six months and that he had no significant complaints.  He had been "largely entirely functional."  Dr. Hayes noted that plaintiff had been working full time.  Six months later, in June 2002, Dr. Hayes noted that plaintiff's inflammatory arthritis was relatively limited and required only Ibuprofen for treatment.

In March 2002, plaintiff told Dr. Lennard that his hand and elbow problems from his 1995 work accident had not changed for several years and caused him only minimal problems with any functional task.  His shoulder had improved since

45

his 1999 work accident and only caused pain with too much lifting or with overhead activities with his left arm.

Plaintiff was released to return to work full time on light or modified duty shortly after his 2001 injury.

This factor supports the ALJ's credibility determination, establishing that plaintiff's arthritis and arm and shoulder problems are not significantly limiting, and that plaintiff was able to work full time for years with these impairments.

### 4.     PRECIPITATING AND AGGRAVATING FACTORS

About a month after plaintiff's injury, Dr. Rethorst found that plaintiff's trapezius muscles and rhomboid muscles were sore with weight lifting of any significance.  The following month, he told Dr. Ceola that driving, lifting, sneezing, coughing, or any prolonged activity would make his symptoms worse.  A month later, plaintiff told Dr. Ceola that his pain increases with any activity.  In March 2002, plaintiff told Dr. Lennard that his right arm and neck are worse with bending, reaching, standing, driving, sneezing, coughing, lifting, climbing, and at times lying. There is no other evidence of precipitating or aggravating circumstances.

### 5.     DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In August 2001, a couple of days after the injury, plaintiff reported that his medication was helping although he was not able to perform any functional activity while on the medicine.  His sleep aid was cut in half to reduce the effects.

That same month, plaintiff reported that his arthritis was relatively stable, doing well on Relafen and Acetaminophen (Tylenol).  Two or three weeks after his injury, he was doing well on Darvocet, one or two a day, mostly in the evenings or at bedtime.  He was not taking many muscle relaxers.  In June 2002, plaintiff was taking only Ibuprofen for his arthritis.  Plaintiff did not report any side effects from his medication.

**6.    *FUNCTIONAL RESTRICTIONS***

Three days after plaintiff's injury, Dr. Rethorst determined that plaintiff could do "desk work only type stuff."  A week after his injury, Dr. Rethorst noted that plaintiff was doing light duty at work and was tolerating it.  He restricted plaintiff's activities as following:  no lifting over five pounds, no forward bending over 20 degrees, no stooping, no kneeling, no climbing, no working above chest level, no prolonged standing, and no repetitive walking.  About a week later, Dr. Rethorst released plaintiff to work modified duty, with no lifting over 20 pounds, no jarring, and no prolonged sitting.  This was 13 days after plaintiff's injury.  The same restrictions were imposed on September 12, 2001.  A week after that, plaintiff's lifting restrictions went from 20 pounds to 25 pounds.  Dr. Rethorst recommended plaintiff do light home weight lifting activities.  On September 25, 2001, plaintiff hd the same restrictions, no lifting over 25 pounds, no jarring, and no prolonged sitting.  He was able to work on modified duty.  On October 2, 2001, the same restrictions applied.

47

A week later, plaintiff saw Dr. Ceola, who recommended plaintiff stay on light duty with no lifting, pushing, pulling, bending, or climbing ladders. He recommended that plaintiff avoid bow hunting or other strenuous activities. A week later, plaintiff's physical therapist recommended that he begin a home exercise program.

On October 16, 2001, plaintiff was put back on light duty with a ten-pound lifting restriction, no jarring, and no prolonged sitting. In March of 2002, Dr. Lennard found that plaintiff should avoid activities that require overhead use of the left arm, he should not lift more than ten pounds, and he should avoid prolonged bending and stooping. By January 2003, about 10 months later, plaintiff was found to be able to lift ten pounds; stand or walk for six hours; sit for six hours; push or pull ten pounds with his hands; he could occasionally climb ramps or stairs, and crawl; could frequently balance, stoop, kneel, or crouch; but could never climb ladders, ropes or scaffolds.

Plaintiff only had a sitting restriction for a couple of months. All of his restrictions are consistent with the limitations found by the ALJ.

**B.    *CREDIBILITY CONCLUSION***

In addition to the above factors, the record indicates that plaintiff's subjective limitations are not supported by the medical records. In February 2001, Dr. Hayes stated that plaintiff's inflammatory arthritis has remained very limited and stable. The same was said in June 2001. On the day of his injury in

August 2001, plaintiff's doctor recommended conservative treatment of Darvocet every six hours as needed and Flexeril to help him sleep. On August 27, 2001, palpation along the spine showed no tenderness. The next day, his inflammatory arthritis was noted to be relatively stable. On August 30, 2001, plaintiff's elbow x-rays were all normal. He had x-rays of his spine, and there were no neurologic findings, no bony injury, and no other acute changes. On September 5, 2001, plaintiff had full range of motion in his lumbar spine, and he had "decent" range of motion in his cervical spine. Lumbar spine films done that day were negative for any abnormalities. There was no sign of disc impingement, and Dr. Rethorst concluded that plaintiff had soft tissue injury. On September 12, 2001, plaintiff noted that his elbow had resolved, and his low back area "seems to have improved some as well." On September 14, 2001, plaintiff's lumbar examination was unremarkable other than "mild" face degenerative changes. His cervical examination was unremarkable other than "moderate" and "minimal" neural foraminal narrowing. On September 25, 2001, plaintiff had a negative MRI of the neck and thoracic spine. On October 2, 2001, plaintiff had full range of motion in his neck. On October 9, 2001, Dr. Ceola found no obvious abnormal curvature in plaintiff's back, no limitations in range of motion in the cervical or lumbar spine. There was no tenderness to palpation in plaintiff's cervical or lumbar spine. His gait was normal, and he could heel toe walk normally.

49

In October 2001, plaintiff told his physical therapist he had experienced some improvement, abut six days later he told Dr. Ceola that physical therapy actually made him worse. On May 16, 2003, plaintiff testified that he hunts with his friends; and described his recent deer hunting, turkey hunting, and weekly fishing. Seven days later, he told Dr. Wilson that he cannot hunt anymore. Dr. Lennard and Dr. Oliver both found that plaintiff could not perform his last job as a maintenance work; however, plaintiff told Dr. Wilson that Dr. Lennard and Dr. Oliver had said plaintiff could not do any work at all.

I find that the above factors support that ALJ's decision to discredit plaintiff, and the inconsistencies which appear in the record also support the ALJ's finding that plaintiff has exaggerated his symptoms. Therefore, plaintiff's motion for judgment on this basis will be denied.

## VII.    EVIDENCE OF PAIN

Plaintiff argues that the ALJ erred in failing to consider evidence of pain. "[S]ome of the diagnoses, rheumatoid arthritis, cervical spondylosis, herniated disc, shoulder impingement, and ulnar neuropathy [nerve injury at the elbow], are inherently painful conditions. . . . [T]he evidence of pain is evident throughout the medical records and evidenced by the bear diagnoses in and of [themselves]."

Contrary to plaintiff's argument, a mere diagnosis is not enough to establish that the possible resulting pain is disabling. Prior to plaintiff's August 2001 injury, his rheumatoid arthritis was described as "very limited and stable"

50

both in February 2001 and in June 2001. On August 28, 2001, plaintiff's arthritis was described as stable. On December 20, 2001, he said his arthritis had done well over the past six months and he had no significant complaints. It was described by the doctor as "well suppressed." On June 20, 2002, his arthritis was described as relatively limited. In December 2002, plaintiff's joints were doing well, except he had some tenderness in one finger on his left hand. There is no evidence that plaintiff's rheumatoid arthritis causes significant pain.

Plaintiff experienced some pain in his elbow after his accident in August 2001 from trying to hold on to the steering wheel. He had x-rays taken on August 30 and they were normal. On September 4, 2001, plaintiff said his elbow had no pain and had been feeling fine. On September 12, 2001, plaintiff said his elbow problem had resolved. In June 2002, plaintiff had full mobility of his elbows. In December 2002, his elbows were unremarkable. There is no evidence that plaintiff experiences significant elbow pain.

Plaintiff complained of shoulder pain in June 2001 (before his injury) which was caused by driving heavy bulk tanker trucks (which he no longer does). After the August injury, plaintiff reported discomfort in his shoulders and he was diagnosed with shoulder strain. In June 2002, plaintiff had full mobility of his shoulders. In December 2002, plaintiff's shoulders were unremarkable. There were almost no complaints dealing with plaintiff's shoulders from 2002 forward.

51

There is evidence of periodic shoulder discomfort, but there is no evidence of ongoing significant shoulder pain.

There is no question that plaintiff suffers pain in his neck. However, the ALJ found that plaintiff's neck pain is not as bad as he alleges. The record supports that finding. Right after his injury, plaintiff was given an anti-inflammatory, a narcotic analgesic as needed for pain, and a muscle relaxer. Three days after his injury, he was released to return to full-time modified work. A few days later when plaintiff said he was still having pain, his doctor continued him on the same medications and recommended physical therapy. On September 5, 2001, plaintiff said he had "some discomfort" in his neck and mid-back. Dr. Rethorst found very local tenderness. He continued plaintiff on his medication (noting that he was taking only one or two Darvocet per day and was not taking many muscle relaxers), and he lifted some of plaintiff's restrictions. On September 18, 2001, Dr. Rethorst continued plaintiff's physical therapy and stated, "I think probably just conservative following over the next couple of weeks will result in significant improvement." He continued plaintiff on the Relafen, a non-steroidal anti-inflammatory. On September 25, 2001, plaintiff said his pain continued to be the same, "really says he is not sore at all." He did, however, had some muscle knotting in his back if he stood in one spot for too long.

Plaintiff complained to Dr. Lennard of pain; however, despite those complaints Dr. Lennard believed that plaintiff could work in a job that limited his

Case 6:04-cv-03558-REL   Document 16   Filed 12/09/05   Page 52 of 58

lifting to ten pounds and did not require prolonged bending and stooping activities. Plaintiff's pain does not prevent him from deer hunting, turkey hunting, climbing trees, attending auctions, fishing, mowing, using a tiller, planting and taking care of his garden, or attending church for several hours at a time.

The ALJ discussed all of these activities in addition to the medical records. I find that the ALJ adequately considered plaintiff's pain, including the fact that plaintiff's pain was treated conservatively and did not result in any doctor finding him disabled from any job, and the fact that plaintiff's pain has not prevented him from engaging in any number of physical activities.

Plaintiff's motion for judgment on the ground that the ALJ did not adequately consider plaintiff's pain will be denied.

### VIII. OPINION OF DR. EVA WILSON

Plaintiff argues that Dr. Wilson's opinion regarding plaintiff's mental disability is "uncontradicted by any evidence, but for the court's opinion."

The opinion of a consulting physician who examined a claimant once does not constitute "substantial evidence" on the record as a whole. Cooper v. Secretary of HHS, 919 F.2d 1317, 1320 (8th Cir. 1990). Even a treating physician's opinion is granted controlling weight only when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.

53

Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

The ALJ had this to say about Dr. Wilson:

The undersigned notes that Dr. Wilson checked several areas moderately or markedly limited on the check block form but these are inconsistent with her narrative report. The undersigned gives greater weight to the narrative report. The undersigned also notes that Dr. Wilson checked that the claimant would not be able to understand, remember and carry out simple instructions, or to make judgments commensurate with unskilled work; but these are again inconsistent with the narrative report which is given greater weight. The check marks are also inconsistent with the evidence as to claimant's actual level of functioning. He drives a vehicle in traffic about 50 miles weekly, operates a riding mower to cut the grass, goes fishing weekly, hunts spring turkeys and was successful last spring after 3 days. He attends church and works in his garden. He tilled the garden last year.

(Tr. at 17-18).

It appears from the records that Dr. Wilson's opinion is based solely on plaintiff's subjective complaints and a "Modified Mini Mental State Evaluation." I find that neither are a basis to support an opinion regarding plaintiff's mental state.

Plaintiff began by telling Dr. Wilson that he had been told by "his physicians" Dr. Lennard and Dr. Oliver that he is unable to work at all. This claim is false. Both doctors stated only that plaintiff would be unable to return to his work as a tanker truck driver. Dr. Lennard stated that plaintiff was restricted only in that he should avoid activities that require overhead use of the left upper extremity as well as lifting more than ten pounds, and prolonged bending and

54

stooping activities.  Dr. Oliver merely answered one question on a form, that is, can plaintiff return to his job as a tanker truck driver.  Finally, neither Dr. Lennard nor Dr. Oliver are plaintiff's "physicians."  They are doctors he saw one time each at the request of his employer and for the purpose of determining whether he could return to his normal duties as a tanker truck driver after his injury in a truck accident.

Next plaintiff told Dr. Wilson that there are times when he cannot even pick up a coffee cup and times when he cannot walk at all.  He also told her that he is no longer able to hunt.  There are no references at all in the medical records to a limitation in plaintiff's ability to walk at all.  He complained one time about weakness in his ankle, and he complained once about experiencing muscle knotting in his back if he stood in one place for too long.  Plaintiff never told any treating physician that he had trouble picking up something such as a coffee cup.  In fact, these statements are completely inconsistent with plaintiff's testimony a mere week before he saw Dr. Wilson.  Plaintiff testified that he was able to hunt, climb ladders, use a tiller, ride a riding lawn mower, plant and weed his garden, and fish on a weekly basis while pitching his rod.  He described his recent hunting activities and even talked of getting a deer and a turkey during those recent hunting seasons.  He was able to use a compound bow shortly after his injury.  All of the above activities are inconsistent with an inability to lift a coffee cup or walk at all.

Plaintiff told Dr. Wilson that he is suffering from memory problems and depression. There is not one allegation of memory problems in any of the medical records in this file. Furthermore, there are very few occasions when depression was mentioned in the course of plaintiff's treatment. On September 25, 2001, plaintiff told Dr. Rethorst he was getting depressed over his situation. By seven days later, he stated to Dr. Rethorst that mentally he was doing better. There are no other references to depression, plaintiff was never diagnosed with depression, he was never treated for depression, he never took any medications for depression, he never participated in counseling, and he never saw a psychologist or a psychiatrist.

Based on the above, I find that plaintiff's subjective report to Dr. Wilson is not credible and therefore cannot be a basis for accepting her opinion as accurate, since Dr. Wilson's opinion is based almost exclusively on plaintiff's statements.

The only test performed by Dr. Wilson was a modified mini mental state evaluation. Her sole comment on this was as follows: "Mr. Crawford produced a score of 52 on this test, which was in the normal range of intellectual functioning." Therefore, the only test showed nothing but normal functioning. There were no tests done which resulted in any abnormal finding, there were no tests done to support any finding at all regarding plaintiff's mental health.

56

Because Dr. Wilson's opinion is based entirely on plaintiff's non-credible subjective reports and only one modified test which showed he is of normal intelligence, the ALJ was entitled to completely discount Dr. Wilson's opinion. Plaintiff's motion for judgment, therefore, on the ground that the ALJ erroneously discredited Dr. Wilson's opinion will be denied.

## IX.    PSYCHOLOGICAL BASIS FOR PAIN

Plaintiff briefly argues that he, "by uncontroverted evidence has post-traumatic stress disorder related to an accident at work. . . .  There is simply no discussion as to whether there is any psychological basis for complaints of pain". The uncontroverted evidence referred to by plaintiff is the opinion of Dr. Wilson, which has been properly discounted.  As discussed above in Section VIII, there is simply no evidence that plaintiff suffered from a psychological impairment or that he suffered from pain which had a psychological basis.  Plaintiff's pain does not prevent him from hunting, fishing, climbing trees, tilling, mowing, putting in a garden, weeding, doing light housework, using a compound bow, or taking care of himself.  Regardless of the source of plaintiff's pain, it is not disabling pain.

## X.    REMAND

Finally, plaintiff states, "[T]he Court may remand for another hearing wherein material evidence [can] be properly considered."  Plaintiff has offered no basis for granting a remand, and I find none.

## XI. CONCLUSIONS

Based on all of the above, I find that the ALJ properly found plaintiff's subjective complaints not credible; the ALJ properly discounted the opinion of Dr. Wilson; and regardless of the basis for plaintiff's pain, the ALJ properly found that plaintiff's pain is not disabling. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed. It is further

ORDERED that plaintiff's motion for remand is denied.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 9, 2005